SEYMOUR POLLACK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pollack v. Commissioner
Docket No. 7174-72
United States Tax Court
T.C. Memo 1982-638; 1982 Tax Ct. Memo LEXIS 108; 45 T.C.M. (CCH) 12; T.C.M. (RIA) 82638; November 3, 1982. Seymour Pollack, pro se. Daniel K. O'Brien and Matthew Magnone, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: This case was assigned to and heard by Special *109 Trial Judge Darrell D. Hallett pursuant to section 7456(c) of the Code [1], and Rules 180 and 181 of the Tax Court Rules of Practice and Procedure.[2] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE HALLETT, Special Trial Judge: Respondent determined deficiencies in petitioner's 1965 and 1968 Federal income tax in the respective amounts of $107,145.39 and $1,018,681.73; and imposed additions to tax pursuant to section 6653(b) for 1965 and 1968 in the amounts of $53,572.70 and $509,340.86, respectively. The issues for decision are (1) Whether petitioner had unreported income from the sale of stock to United Security Life Insurance Company during 1965; (2) whether petitioner had unreported income from the sale of Coin Meter Company stock during *110 1965; (3) whether petitioner had unreported income from the sale of Dumont Corporation stock during 1968; (4) whether the statute of limitations bars assessment and collection of deficiencies for 1965 and 1968; and (5) whether petitioner is liable for the additions to tax provided by section 6653(b) for the taxable years 1965 and 1968 due to fraud. FINDINGS OF FACT Some of the facts in this case have been stipulated and are found accordingly. At the time the petition was filed in this case, petitioner resided at the Federal Correctional Institute in Danbury, Connecticut. Petitioner was then married and his wife resided in Fort Lee, New Jersey. Petitioner failed to file Federal income tax returns for the taxable years 1965 and 1968. Petitioner was aware at the time he was required to file Federal income tax returns for 1965 and 1968 that profits from the sale of securities constituted taxable income and that he had a legal obligation to file Federal income tax returns. During the taxable years 1965 and 1968, petitioner was engaged in business operations which were concerned with the acquisition and disposition of stocks and securities. In 1968, Mr. John Dahill, then *111 a revenue officer with the Collection Division, Internal Revenue Service, was assigned to solicit delinquent income tax returns for Datacomp Service Corporation (Datacomp). Mr. Dahill went to the offices of Datacomp in Fort Lee, New Jersey, identified himself to the receptionist there, and asked to speak with someone concerning "a tax situation." Mr. Dahill was taken to an office and introduced to an individual who was stated to be a financial adviser for Datacomp. That person introduced himself as Mr. Powell. After some discussion with the individual representing himself as Mr. Powell, Mr. Dahill returned to his office and after some investigation ascertained that "Mr. Powell" was actually the petitioner, Mr. Pollack. Mr. Dahill later returned to the offices of Datacomp and had a further discussion with petitioner wherein petitioner admitted that he was Seymour Pollack. On April 17, 1969, petitioner was convicted in the Northern District of Alabama on charges of conspiring to fraudulently obtain and convert certain monies, securities, and other assets of the United Security Life Insurance Company (United), in violation of 18 U.S.C. Secs. 371, 1341, 1343, *112 2314, and 15 U.S.C. Sec. 77 q (a). On March 20, 1974, petitioner was convicted in the District of Columbia on charges of conspiring to devise a scheme to defraud shareholders or prospective shareholders of Control Metals Corporation by false and fraudulent pretenses in violation of 18 U.S.C. Secs. 1341, 1343, and 15 U.S.C. Sec. 77 (e), (x). 1965 United Transaction
In 1965, Nicholas Papadakos was engaged in the investment business in New York City. In connection with his business, he was handling the affairs of two publicly held companies, General Holding Corporation (General Holding), and Fifth Avenue Industries, Inc. (Fifth Avenue). Mr. Papadakos had known petitioner for a year or two prior to 1965. In October 1965, Mr. J. Ernie Gaskin and Claude Carpenter, Jr., a Little Rock, Arkansas, attorney, flew from Little Rock to New York City to attend a Young Democrats' convention. Mr. Pollack met Mr. Gaskin and Mr. Carpenter at the airport in New York and provided a limousine to drive them to a downtown hotel. Thereafter, petitioner introduced Mr. Gaskin to Mr. Papadakos and the three of them had a business *113 meeting at Mr. Papadakos' office. Mr. Gaskin and Mr. Papadakos then entered into an agreement whereby Mr. Papadakos was to borrow $5,500 from Mr. Gaskin, which was to be repaid with 6 percent interest on or before October 13, 1966. As security for the loan, Mr. Papadakos was to transfer to Mr. Gaskin 75,000 shares of common stock in both General Holding and Fifth Avenue. The transfer of the share certificates by Mr. Papadakos to Mr. Gaskin was solely for security purposes, and it was agreed that Mr. Gaskin had no authority to sell the shares except in the event of default on the loan by Mr. Papadakos. Pursuant to this agreement, Mr. Papadakos was paid $5,170 ($5,500 less advance interest deducted), first by a check drawn on a bank account of Mr. Gaskin and, following the return of the check for nonsufficient funds, by cash from a Mr. Corriston (who was a friend of petitioner). Also pursuant to the agreement, Mr. Papadakos delivered stock certificates to Mr. Gaskin representing 75,000 shares of common stock in Fifth Avenue and 75,000 shares of common stock in General Holding, together with assignments endorsed in blank by Mr. Papadakos. After Mr. Gaskin completed these transactions *114 with Mr. Papadakos, Mr. Gaskin and petitioner entered into two agreements (dated October 21, 1965) with United, a life and health insurance company located in Birmingham, Alabama. In the first of these agreements, Mr. Gaskin and petitioner represented that they were owners of 75,000 shares of common stock in each of the corporations, Fifth Avenue and General Holding. The agreement provided that petitioner and Mr. Gaskin would sell to United the shares of stock in the two corporations for $300,000 payable $150,000 immediately upon execution of the agreement and $150,000 by October 26, 1965. The second agreement provided that for a period of one year United would have the option to sell the stock in the two corporations back to petitioner and Mr. Gaskin for $318,000. By assignments dated October 21, 1965, petitioner and Mr. Gaskin purported to assign the stock in Fifth Avenue and General Holding to United pursuant to the agreement. United issued a check payable to Mr. Gaskin and petitioner in the amount of $150,000 on October 21, 1965. This check was endorsed by both petitioner and Mr. Gaskin, and it was cashed at the First National Bank of Birmingham, in Birmingham, Alabama. *115 Out of the proceeds, $120,000 was used to purchase a bank manager's check paid to Mr. Gaskin and $30,000 in currency was paid directly to Mr. Pollack. The $120,000 bank manager's check was given to Mr. Carpenter, who deposited the check in a trustee account with the American National Bank of Little Rock, Arkansas. On October 22, 1965, Mr. Carpenter, at the direction of either Mr. Gaskin or petitioner, or both, drew a check on the trustee account in the amount of $31,300 payable to Mr. Gaskin. Mr. Gaskin used the proceeds of this check to purchase a cashier's check for $31,300 which in turn was used to transmit by wire $31,183 to petitioner in New Jersey. On October 26, 1965, United made the second payment due pursuant to the October 21, 1965, agreement by issuing a check in the amount of $150,000 payable to Mr. Gaskin and petitioner. This check was endorsed by petitioner and Mr. Gaskin and was cashed at the First National Bank of Birmingham. Out of the proceeds, $80,000 was used to purchase a bank manager's check, which was given to Mr. Carpenter and was deposited to the trustee account in Little Rock. Mr. Carpenter, on October 26, 1965, pursuant to instructions from petitioner *116 and Mr. Gaskin, drew a check in the amount of $20,000 on the trustee account, which was paid to petitioner and Mr. Gaskin. Further disbursements from the trustee account were made to or on behalf of Mr. Gaskin. In addition, two bank manager's checks of $25,000 each were purchased on October 26, 1965 at the First National Bank of Birmingham, were endorsed by petitioner, and the proceeds were deposited to a newly opened checking account in the name of Trans American Marketing Corporation at the Manufacturers Hanover Trust Company in New York City. Petitioner was designated as president of Trans American Marketing Corporation and was authorized to draw checks on the corporation's account. By check dated December 30, 1965, in the amount of $300,000, signed by petitioner and drawn on the account of Trans American Marketing Corporation, petitioner purported to make a partial payment to United for the repurchase of the Fifth Avenue and General Holding stock, pursuant to the prior agreement. However, the $300,000 check was returned due to insufficient funds, and no further amount was ever paid by petitioner or Mr. Gaskin to United pursuant to the agreement. United later suffered financial *117 difficulties, and its business was sold in 1970. Its president, who dealt with petitioner and Mr. Gaskin on behalf of United in connection with the transactions herein described, committed suicide. Sometime after the transactions between petitioner, Mr. Gaskin, and United, United demanded that Mr. Papadakos either purchase from United the stock involved, or assist them in selling it. Mr. Papadakos informed United that the stock then claimed by United was actually his stock, and was only to be held by Mr. Gaskin as security for his loan from Mr. Gaskin. Mr. Papadakos did not repay the money loaned him by Mr. Gaskin, nor were the stock certificates ever returned to Mr. Papadakos. 1965 Coin Meter Company Transaction
Petitioner had a 50 percent stock interest in a corporation called Coin Meter Company. During 1965, petitioner's interest in this corporation was sold, and consideration was paid to or on behalf of petitioner for his interest. 1968 Dumont Corporation Stock Transactions
In late 1967, an agreement was entered into by and between Joseph Prisco, Leon Wolk, and Datacomp Service Corporation. Mr. Prisco, on behalf of himself and two other individuals, purported *118 to own 99 percent of the outstanding capital stock of Datacomp Service Corporation, a New York Corporation. Mr. Prisco and those he represented agreed to transfer this stock to a newly formed New Jersey corporation, also to be called Datacomp Service Corporation, Inc. (hereinafter Datacomp). Mr. Wolk, representing himself and others, including petitioner, agreed to form the New Jersey corporation and caused it to acquire the assets and liabilities of the New York corporation in exchange for the newly formed New Jersey corporation stock. Datacomp was in fact incorporated in New Jersey and it thereafter issued stock certificates, including 59,917 shares issued in the name of "T.A.P." Corporation. T.A.P. Corporation is the same entity that purported to operate under the name of A.P.T. Corporation. Petitioner was president and the principal or sole stockholder of A.P.T. Corporation. A resolution was adopted by the Board of Directors of Datacomp on January 3, 1968, authorizing the executive committee of the corporation to appoint petitioner as agent for the company to "enter into negotiations on behalf of the company to acquire, or be acquired by any corporate entity deemed to be *119 in the best interest of the company." On May 9, 1968, an agreement was signed by petitioner, as agent for Datacomp and Dumont Corporation (Dumont), a Utah corporation, whereby Dumont agreed to purchase all of the assets and assume the liabilities of Datacomp. Dumont agreed to pay for the assets and liabilities of Datacomp with shares of its common stock. This agreement was ratified by the board of directors of Datacomp on June 25, 1968. Thereafter, the original shareholders of Datacomp, including A.P.T. Corporation, received 5.2 shares of Dumont stock for each share of Datacomp they held. As a result, A.P.T. Corporation ended up with in excess of 311,000 shares of Dumont stock. A certificate of incorporation was issued by the State of Delaware for A.P.T. Corporation on June 14, 1968. As of April 15, 1971, the State of Delaware determined that the corporation became inoperative because of its neglect or refusal to pay annual franchise taxes for two consecutive years. On July 24, 1968, a checking account was opened in the name of A.P.T. Corporation at the Englewood National Bank and Trust Company, Englewood, New Jersey (which later became the Midland Bank and Trust Company). Petitioner, *120 named as president of the corporation, was the only authorized signature on the account. The address of A.P.T. Corporation for purposes of this account was given as 2185 Lemoine Avenue, Fort Lee, New Jersey, which was the home address of petitioner in 1968. On July 8, 1968, petitioner caused a stock brokerage account to be opened with Shaw Hooker and Company in San Francisco in the name of A.P.T. Corporation, whose address was given as 2185 Lemoine Avenue, Fort Lee, New Jersey, "c/o S. Pollack." Also on July 8, 1968, petitioner caused a stock brokerage account to be opened with Meyerson and Company, San Francisco, in the name of A.P.T. Corporation, c/o Sy Pollack, 2185 Lemoine Avenue, Fort Lee, New Jersey. The application for this account indicated, under type of business, "business consultant." In the fall of 1968, a third brokerage account was opened by petitioner in the name of A.P.T. Corporation with Schwabacher and Company, Las Vegas, Nevada. Between early May 1968, when Dumont acquired Datacomp and A.P.T. Corporation was issued Dumont stock, and mid-October 1968, the bid price for Dumont stock rose from 1-3/8 to 10-1/2. Between July 15, 1968 and October 4, 1968, Shaw *121 Hooker and Company credited to the account of A.P.T. Corporation a total of $647,325 with regard to sales of Dumont stock held in the name of A.P.T. Corporation. The following payments were made by Shaw Hooker and Company with respect to the account: (1) On July 8, 1968, a check was issued to Datacomp in the amount of $35,000, and was deposited to an account maintained in the name of Datacomp at the Fort Lee Trust Company, Fort Lee, New Jersey; (2) a check in the amount of $40,000 was issued on July 17, 1968, payable to A.P.T. Corporation and was cashed out by petitioner on July 17, 1968 at the Crocker Citizens National Bank, San Francisco; (3) a check dated July 17, 1968, in the amount of $46,875 was issued to A.P.T. Corporation and was endorsed by petitioner as president of A.P.T. Corporation and by the Security Mortgage Investment Corporation. In addition, between August 13, 1968 and October 4, 1968, funds representing proceeds from the sale of Dumont stock sold in connection with the Shaw Hooker and Company account totaling $478,413 were transferred to the bank account maintained in the name of A.P.T. Corporation with the Englewood National Bank. Between August 19, 1968 and *122 September 9, 1968, shares of stock in Dumont were sold through the brokerage account maintained in the name of A.P.T. Corporation with Schwabacher and Company totaling $53,275.53. The funds due with respect to these sales were paid as follows: (1) By check dated September 6, 1968, payable to A.P.T. Corporation in the amount of $48,733.44, endorsed by A.P.T. Corporation by William W. Morris, attorney in fact for the corporation, for deposit only to a Chicago Title Company escrow account; (2) by check dated September 20, 1968, in the amount of $4,542.09 payable to A.P.T. and deposited into the checking account of A.P.T. Corporation at the Englewood National Bank. On July 16, 1968, shares of stock in Dumont were sold and credited to the account of A.P.T. Corporation with Meyerson and Company in the total amount of $74,180.92. The proceeds due with respect to these sales were paid by a check drawn on Meyerson and Company dated July 11, 1968, in the amount of $74,098.42 payable to A.P.T. Corporation, c/o S. Pollack. The check was cashed by petitioner at the Wells Fargo Bank, San Francisco on July 12, 1968. On October 3, 1968, petitioner wrote two checks to cash drawn upon the A. *123 P.T. Corporation bank account at the Englewood National Bank. These checks were endorsed and cashed by petitioner the same day. The next day, October 4, 1968, petitioner and his wife sailed for Europe on board the S.S. United States. On September 6, 1968, Dale E. Webb Corporation sold a house located at 75 Bluff Road, Fort Lee, New Jersey, to petitioner for $150,000. The title to the property was taken in the name of Ralph Freedson, trustee for Seymour Pollack. At least $100,000 of the purchase price of this property was paid from the bank account maintained in the name of A.P.T. Corporation at the Englewood National Bank. After the transfer of the 75 Bluff Road property to Mr. Freedson, Mr. Freedson transferred the property to Pierre Mailloux, who was petitioner's lawyer and acquired the property as trustee for petitioner. Thereafter, Mr. Mailloux transferred the property to a corporation named E. Dee Records, Inc., which was a dormant corporation owned by Mr. Joseph Gold, also one of petitioner's attorneys. Mr. Gold was acting solely on behalf of petitioner in connection with the transfer of the property. In this regard, petitioner approached Mr. Gold in 1968 and asked *124 him if he had a corporation "lying around" and that petitioner wanted to put the house in the name of a corporation. Mrs. Arlene Pollack, wife of petitioner, was the sole stockholder of E. Dee Records, Inc.On May 20, 1970, Mr. Arthur Imperatore purchased the house at 75 Bluff Road from E. Dee Records, Inc. Mr. Imperatore executed a purchase money mortgage in the amount of $142,000 in connection with this transaction. Payments on the mortgage were thereafter made to Mrs. Arlene Pollack, and later the mortgage was paid off by check issued to E. Dee Records, Inc. in the amount of $132,666.55. ULTIMATE FINDINGS OF FACT (1) Petitioner realized gross income of $150,000 as a result of his participation in the sale of securities to United in 1965; (2) Petitioner had long-term capital gain as a result of the sale of Coin Meter Company stock during 1965; (3) A.P.T. Corporation was formed solely for the purpose of holding title to shares of stock of Dumont Corporation, and providing a conduit through which the proceeds from the shares of stock could be diverted to or disbursed under the direction and personal control of petitioner. A.P.T. Corporation was neither formed for the purpose *125 of carrying on a business activity as a separate entity nor did it actually carry on a trade or business as an entity separate and apart from petitioner; (4) Petitioner realized gross income of $774,781.45 as a result of sales of Dumont stock held in the name of A.P.T. Corporation during 1968; and (5) A part of the underpayment in tax due from petitioner for the taxable years 1965 and 1968 is due to fraud. OPINION SALE OF STOCK TO UNITED
Respondent determined in the deficiency notice that petitioner had unreported gross income in the amount of $150,000 as a result of the transaction involving petitioner, Mr. Gaskin, and United. Respondent relies principally upon the written agreement of October 21, 1965 between United, Mr. Gaskin, and petitioner, wherein petitioner and Mr. Gaskin represented that they were owners of Fifth Avenue and General Holding stock, and purported to convey their interest in the stock to United for $300,000. In addition to the execution of the agreement itself, respondent points to the fact that $300,000 was actually paid to petitioner and Mr. Gaskin pursuant to the agreement, stock certificates were signed over to United, and a significant portion *126 of the sales proceeds can be traced directly to petitioner. Citing James v. United States,366 U.S. 213 (1961), respondent argues that the fact that petitioner and Mr. Gaskin misappropriated the stock from Mr. Papadakos does not negate taxation of the proceeds from the sale. We agree with respondent that petitioner has completely failed to disprove respondent's determination that petitioner had taxable gain resulting from the sale of stock to United. In fact, petitioner did not even deny that he and Mr. Gaskin did purport to sell the stock involved to United. [3] Instead, petitioner simply claimed that he "wound up in the deficit position in Arkansas" and alleged in general terms in support of this contention that he was trying to "bail out" Mr. Gaskin from his financial difficulties, and that monies paid to petitioner from the proceeds of the stock sale were nothing more than repayments of amounts petitioner had previously advanced to or on behalf of Mr. Gaskin. If petitioner's contention amounts to an argument that he did not have a real economic interest in the stock sale *127 to United, we reject it. The testimony and documentary evidence establish beyond question that an agreement of sale was actually entered into and that in the agreement petitioner unqualifiably represented himself to be a co-owner of the stock involved. Neither is there any dispute that, pursuant to the terms of sale, assignments were executed and $300,000 was actually paid to the sellers -- petitioner and Mr. Gaskin. In contrast to petitioner's vague and general testimony that he advanced money, in connection with other transactions, to or for the benefit of Mr. Gaskin, there is specific and uncontradicted evidence that over $60,000 in cash from the sales proceeds was paid to petitioner personally, and another $50,000 was paid to a corporate bank account which he controlled. Even if we were to assume that petitioner advanced to or for the benefit of Mr. Gaskin as much or more than his share of the stock proceeds, that would provide no basis for disregarding the sale for tax purposes. At most, petitioner would be entitled to a bad debt deduction for valid indebtedness due him from Mr. Gaskin for the taxable year during which the indebtedness became worthless. In reaching these *128 conclusions, we recognize petitioner's argument that he was not a party to the loan agreement between Mr. Gaskin and Mr. Papadakos, with respect to which the share certificates representing stock of General Holding and Fifth Avenue were obtained. While there is considerable evidence indicating that petitioner was in fact a participant in this transaction, we need not decide whether there was in fact a wrongful appropriation of the stock. The critical fact is that petitioner sold the shares and claimed a portion of the proceeds under claim of right. That is all that is required to make petitioner taxable on his purported share of the gain from the sale. See James v. United States,supra;McSpadden v. Commissioner,50 T.C. 478 (1968). [4]
*129 COIN METER COMPANY TRANSACTION
Respondent determined that petitioner had long-term capital gain in the amount of $68,301.54 resulting from the sale of Coin Meter Company stock in 1965. Respondent submitted no evidence on this transaction, and instead relied upon petitioner having the burden of proof and respondent's deficiency notice carrying the presumption of correctness. See Rule 142, Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). Not only did petitioner fail to prove that respondent's determination was wrong, but his testimony establishes that he had unreported gain from the transaction in question. In this respect, petitioner testified that he was "partners" in Coin Meter Company, which was located in Miami, Florida, and dealt in various types of appliances. Petitioner further testified that the company was in fact sold, and his 50 percent share of the proceeds resulting from the sale was paid over to an attorney, and was in turn disbursed by the attorney to individuals who had previously advanced money to petitioner. In short, petitioner did not dispute the fact that there was a sale nor did he dispute respondent's *130 calculation of the gain on the sale. [5] Rather, his sole contention for defeating respondent's determination on this matter is that he personally received none of the proceeds. It is fundamental that a taxpayer's assignment of income to another does not make the income nontaxable. Lucas v. Earl,281 U.S. 111 (1930). Accordingly, we sustain respondent's determination on this item.
DUMONT CORPORATION STOCK SALES
Respondent's deficiency notice determined that petitioner had income in the amount of $1,375,058.44 in connection with the sale of Dumont stock during the taxable year 1968. Respondent asserts that income from the sale of Dumont stock held in the name of A.P.T. Corporation should be taxable to petitioner because A.P.T. Corporation was a sham corporation and should not be recognized for tax purposes. With regard to the amount of income attributed to petitioner in the notice of deficiency with respect to the sale *131 of Dumont stock respondent relies upon records of the three brokerage firms (Shaw Hooker and Company, Meyerson and Company, and Schwabacher and Company) reflecting that the sales proceeds from the sale of Dumont stock credited to the account of A.P.T. Corporation totaled $774,781.41. For the balance of the income attributed to petitioner with respect to the sale of Dumont stock, respondent relies upon the stock transfer records of Dumont showing that 59,800 shares of stock held in the name of A.P.T. Corporation were transferred to various individuals and entities. Although there is no specific evidence concerning the amount realized in connection with the transfers of these 59,800 shares, respondent points to the fact that during the time these transfers took place, July 11, 1968, through November 5, 1968, Dumont stock was selling for at least $9.00 per share. In the alternative, and in the event the Court determines that A.P.T. Corporation should be recognized for tax purposes and gain from the sale of securities in the name of A.P.T. Corporation cannot be directly attributed to petitioner, respondent argues that petitioner had constructive dividends totaling $552,268 from A. *132 P.T. Corporation and relies in support of that argument upon evidence concerning disbursements of monies held in the name or account of A.P.T. Corporation to or for the benefit of petitioner. Petitioner argues that he had no gain resulting from the sale of Dumont stock held in the name of A.P.T. Corporation. Petitioner's sole argument in support of this contention appears to be that the sales of stock held in the name of A.P.T. Corporation were made solely for the account of Dumont Corporation, and that A.P.T. Corporation and/or petitioner was merely acting as an agent for Dumont in selling the stock and collecting some or all of the sales proceeds. Petitioner argues that Dumont was obligated to "replace" the stock which A.P.T. Corporation sold during the year 1968, but failed to do so. We will first address petitioner's arguments. Other than petitioner's bare assertion, there is simply no evidence in the record to support his contention that the sales of Dumont stock in the name of A.P.T. Corporation were made on behalf of Dumont, and that petitioner and/or A.P.T. Corporation was merely acting as an agent on behalf of Dumont in carrying out these transactions. Petitioner *133 appears to place great weight upon testimony and documents he contends establish that he and/or A.P.T. Corporation made in excess of $1,000,000 in loans to Dumont. The evidence is insufficient to establish that in fact petitioner and/or A.P.T. Corporation made substantial loans to Dumont. [6] However, even assuming petitioner and/or A.P.T. Corporation loaned Dumont in excess of $1,000,000 as contended by petitioner, we fail to see how that supports petitioner's contention that the transactions in Dumont stock were undertaken solely on behalf of Dumont. In this regard, if in fact the Dumont stock sales petitioner directed through the three brokerage accounts were being made solely on behalf of Dumont, and petitioner was acting as an agent for Dumont, obviously petitioner would be obligated to turn the proceeds over to Dumont, or account for them. Dumont Corporation certainly would not become indebted to petitioner for monies he did pay over to the corporation, but it would simply be receiving monies that it was already entitled to. If the Dumont stock was turned over to petitioner in satisfaction of prior indebtedness due petitioner, then petitioner's sale of the stock would clearly *134 be taxable to him. Moreover, aside from petitioner's self-serving testimony, [7] there is no testimony nor documentary evidence supporting petitioner's theory that Dumont stock sales were made solely on behalf of Dumont. In fact, all of the evidence points to the contrary. For example, the documents concerning the establishment and management of the brokerage accounts contain no indication whatsoever that the accounts were being *135 opened and maintained on behalf of Dumont rather than A.P.T. Corporation and/or petitioner. More significantly, the disposition of the sales proceeds from the accounts belies petitioner's contention that these proceeds belonged to Dumont and not to petitioner. *136 Our findings of fact disclose that a substantial amount of the Dumont sales proceeds can be traced directly to petitioner, including very substantial cash payments to petitioner and at least $100,000 utilized (through a very circuitous route) to purchase a residence for petitioner. Petitioner submitted no evidence whatsoever of any accounting he ever made to Dumont concerning the disposition of these funds. In short, we conclude that petitioner's agency contention is nothing more than a theory concocted to avoid being taxed on the substantial gain recognized from the sale of the Dumont securities. Since the transactions giving rise to the gain in question were of stock in the name of A.P.T. (purportedly a corporation) and the transactions were undertaken through accounts maintained in the name of A.P.T. Corporation, we must decide whether gain from the transactions is attributable to A.P.T. Corporation, as a taxable entity, or whether the gain can be attributed to petitioner individually. Generally, a corporate entity will not be disregarded for tax purposes so long as it is formed for a substantial business purpose or actually engages in a business activity after its formation. *137 Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943). On the other hand, where a corporation is a mere shell and is not shown to have been either formed or conducted for any significant, nontax business purpose, its existence will be disregarded for tax purposes, even though it may be validly incorporated under state law. Noonan v. Commissioner,52 T.C. 907, 910 (1969), affd. 451 F.2d 992 (9th Cir. 1971); Shaw Construction Company v. Commissioner,35 T.C. 1102 (1961), affd. 323 F.2d 316 (9th Cir. 1963). In this case, we have concluded that A.P.T. Corporation was formed and utilized by petitioner solely for the purpose of furthering a scheme to market the shares of Dumont stock for his personal benefit and to conceal his own participation in the scheme. In reaching this conclusion, we have considered the following: (1) There is no evidence in the record that A.P.T. Corporation did anything other than hold bare title to the Dumont stock beginning with the period shortly before the Dumont stock sales were undertaken, and ending approximately six months later when the sales were completed; (2) petitioner's *138 own testimony establishes that funds purportedly belonging to A.P.T. Corporation and petitioner's own personal funds were hopelessly commingled such that even petitioner could not account for or distinguish between the two; (3) petitioner controlled and managed the brokerage accounts and bank accounts in the name of A.P.T. Corporation as his own, causing funds from these accounts to be paid directly to himself and to be utilized for his own benefit. As we concluded in Noonan v. Commissioner,supra at 910, the corporation involved here is nothing more than "bones * * * without flesh." Accordingly, we conclude that respondent correctly attributed income from the sale of Dumont stock held in the name of A.P.T. Corporation to petitioner. Since we have reached this conclusion, we need not address respondent's alternative argument that petitioner recognized constructive dividends from A.P.T. Corporation during the tax year 1968. It remains to be resolved, however, the amount of income which should be attributed to petitioner as a result of the Dumont stock transactions. As stated in our findings of fact, the documentary evidence submitted by respondent shows *139 sales totaling $774,781.45. The evidence also establishes that the proceeds of these sales were paid to petitioner directly, or they were deposited in the A.P.T. Corporation bank account controlled by petitioner, and, in turn, a substantial portion of the proceeds were paid from the A.P.T. Corporation bank account directly to petitioner. To this extent, we believe the evidence supports attributing this income to petitioner. However, we conclude that petitioner did not realize income from Dumont stock sales in any greater amount. In reaching this conclusion, we recognize respondent's argument that the stock transfer records reflect additional transfers of Dumont shares in the name of A.P.T. Corporation to various individuals and entities, but without more details of the transactions involved in these transfers, we decline to conclude that the transactions should be considered sales for consideration in accord with the then current market price of Dumont stock. [8]
*140 FRAUD ADDITION 1965 and 1968
Respondent has the burden of proving, by clear and convincing evidence, that a part of the underpayment for each of the years 1965 and 1968 was due to fraud. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. To meet this burden, respondent must show that petitioner intended to evade taxes which he knew or believed he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Petitioner's entire course of conduct may be relied upon as circumstantial evidence of fraudulent intent. The presence or absence of fraud is a factual question to be determined by an examination of the entire record. See Afshar v. Commissioner,T.C. Memo. 1982-241 and the authorities cited therein. Finally, while mere failure to file returns does not establish fraud, failure to file may be considered as circumstantial evidence of fraud. Afshar v. Commissioner,supra;Beaver v. Commissioner,55 T.C. 85, 93 (1970). With these principles in mind, we have evaluated the record in this case and come to the firm conclusion that respondent has met his burden with respect *141 to each of the taxable years involved. With respect to petitioner's failure to file returns for the years in question, petitioner's reply filed in response to affirmative allegations in respondent's answer unqualifiedly admitted that petitioner did not file tax returns for 1965 and 1968. Likewise, petitioner himself affirmed this admission in proceedings before this Court prior to trial. However, at trial, petitioner attempted to place this matter in issue and apparently at one point contended he did in fact file returns. However, when questioned specifically and under oath concerning this matter, petitioner equivocated and concluded "I don't know if I did or not." Petitioner submitted no evidence that he did file returns. On the other hand, respondent submitted evidence from various IRS Service Centers showing that there is no record of petitioner filing for either year in question. Finally, during 1968 when petitioner was interviewed by Mr. Dahill, then a collection officer with the Internal Revenue Service, Mr. Dahill told petitioner that the Internal Revenue Service had no record of petitioner filing individual returns for 1964, 1965, or 1966 and asked petitioner whether *142 returns had been filed by him for those years. Petitioner responded at that time he was "not sure if he had filed these returns, and, if he had, he does not know where he filed the returns." We conclude that petitioner did not file returns for 1965 and 1968. We also conclude that petitioner was well aware that he had gross income during 1965 and 1968 and was required to file returns. Aside from the admission in petitioner's reply regarding his knowledge of income tax matters, the record establishes that petitioner is, and was during the years in question, a sophisticated and intelligent individual. He participated with Mr. Gaskin in purporting to sell securities to United in 1965 for $300,000 and he caused a substantial portion of the proceeds from the sale to be paid directly to himself. Similarly, he directed substantial sales of Dumont stock through brokerage houses in 1968, and personally reaped substantial financial benefit from these transactions. Further, although petitioner told Mr. Dahill in 1968 that he was "living off borrowed funds" in 1965 and prior years and he likewise testified in this case that if he filed a return in 1968 "it would have shown a minus thing. *143 I had to borrow money * * *", he on the other hand has claimed to have personally and through A.P.T. Corporation advanced over $1,000,000 to Dumont during late 1967 and 1968. We do not accept petitioner's contention that all of his efforts and activities in connection with the United transaction and the sale of Dumont securities were merely gratuitous and were undertaken without compensation and solely to assist Mr. Gaskin in 1965 and Dumont in 1968. Rather, we conclude that petitioner had a direct financial interest in these activities, and that he was well aware of the financial gain he derived from the activities during the periods in question. Finally, petitioner's false representation as to his identity when interviewed by Mr. Dahill and his use of accounts in the names of others through which to funnel funds directly to himself both in 1965 in connection with the United transaction and in 1968 in connection with the Dumont security sales shows deliberate concealment of income for the purpose of evading tax. In short, we believe the evidence is overwhelming that a part of the underpayments in each year is due to fraud. STATUTE OF LIMITATIONS
Since respondent's *144 deficiency notice was mailed well beyond the normal three-year period for assessing a deficiency with respect to both taxable years involved, the statute of limitations bars the deficiencies, unless one of the exceptions to the general three-year period contained in section 6501 is applicable. At least two of the exceptions apply here. First, since petitioner did not file returns for either 1965 or 1968, the statute is open under section 6501(c)(3), and since a part of the underpayment for each of the years in question is due to fraud, the statute of limitations is open under section 6501(c)(1) and (2). Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. The Court has concluded that the post-trial procedures of Rule 182, Tax Court Rules of Practice and Procedure↩, are not applicable in these particular circumstances. This conclusion is based upon the authority of the "otherwise provided" language of that rule.
3. Petitioner testified that "we" made a "deal" with the president of United.↩
4. Respondent concedes petitioner's entitlement to capital gain on the transaction, so that we need not consider whether the transaction in fact qualifies for such treatment. Further, although respondent has allowed petitioner no basis in the stock, petitioner has failed to prove he had any basis which could be used to reduce his gain from the sale, nor does the record contain any evidence whatsoever sufficient to allow basis.↩
5. As in the case of the gain resulting from the United transaction, since respondent allowed petitioner long term capital gain treatment regarding the Coin Meter Company stock sale, we need not consider whether it in fact so qualifies.↩
6. Petitioner filed a claim in bankruptcy proceedings involving Dumont and Datacomp alleging that he personally made loans to these corporations in the amount of $330,114.70, and that A.P.T. Corporation made loans in the amount of $700,000. However, in testimony petitioner gave in connection with the bankruptcy proceedings, he denied that he "personally" advanced any monies to Dumont or Datacomp. Further, petitioner sought to introduce in a post-trial deposition a summary sheet prepared by Sol Karpman, an accountant, in 1969. We admit the document (Exh. 6) in evidence, but conclude that, because of its very general nature and Mr. Karpman's lack of specific recollection to explain the meaning of the document, it should be afforded little weight.↩
7. As set forth in our findings of fact, petitioner was convicted on Federal felony charges on at least two occasions (1969 and 1974). These convictions were admitted into evidence solely as they relate to petitioner's credibility. See Rule 609, Federal Rules of Evidence. Although the record contains evidence as to two other convictions, in 1972 and 1981, we give these no weight because of insufficient evidence to determine whether they meet the requirements of Rule 609. We have considered the 1969 and 1974 convictions in reaching our conclusion that petitioner's testimony regarding his contention as to his role in the Dumont securities transactions is not credible. However, wholly aside from the convictions, our evaluation of petitioner's testimony, in light of the objective facts of record, as well as his general demeanor on the witness stand, leads us to place little reliance upon his credibility.↩
8. Respondent's deficiency notice treated the entire gain on the sale of the Dumont shares as ordinary income to petitioner, and allowed petitioner no basis in the shares. Petitioner submitted no evidence concerning the cost or other basis to himself and/or A.P.T. in the Dumont stock, nor is there sufficient evidence in the record to allow any basis. Likewise, petitioner has clearly failed to prove, nor has he ever raised the contention, that the Dumont sales qualify for capital gains treatment.↩